EXHIBIT A

DECLARATION OF F. GERARD HEINAUER

F. GERARD HEINAUER, pursuant to 28 U.S.C. § 1746, declares
the following:

1.  I am employed by the Department of Homeland Security
    ("DHS"), Citizenship and Immigration Services Division
    ("USCIS"), as the Director of the Nebraska Service
    Center in Lincoln, Nebraska.  It is in that capacity
    and based upon reasonable inquiry and my knowledge,
    information and belief that I provide this declaration.

2.  I am a named defendant in the case Alexey Stepanov v.
    Chertoff, et al., 07-02492, presently pending in the
    United States District Court for the Northern District
    of California.  Plaintiff Alexey Stepanov was born in
    Russia, assigned alien registration number A98 470 421,
    and seeks to have his pending Form I-485, Application
    for Adjustment of Status, adjudicated.

3.  Plaintiff filed his Form I-485 at the California
    Service Center on June 17, 2005, through a California
    attorney of record who has not withdrawn from her
    representation of the alien before the agency.  The
    Form I-485 was assigned receipt number WAC-05-182-52411
    and remains pending.  Due to a realignment of Service
    Center workloads, the application was transferred to

the Nebraska Service Center on March 9, 2007, for
completion of the adjudication process.

4.  Plaintiff's adjustment of status application is based
on an application for permanent employment
certification for a second preference professional
worker (advanced degree/professional) position filed
with the U.S. Department of Labor by KLA Tencor
Corporation (KLA Tencor), on June 17, 2005.  The U.S.
Department of Labor certified the position, thus
indicating that there are not sufficient U.S. workers
available to fill the position and that employment of a
qualified alien in the position described will not
adversely affect the wages and working conditions of
similarly-employed workers in the United States.  The
priority date for the labor certification, usually
established by the date the request was initially
accepted for processing, is August 17, 2001.

5.  The approved labor certification was filed with USCIS
along with a Form I-140 immigrant visa petition for
alien worker on June 17, 2005, by KLA Tencor, on behalf
of Plaintiff.  The visa petition was approved August
17, 2005.  The goal of the I-140 and I-485 filings are
to obtain lawful permanent resident ("green card")

status for Plaintiff and any qualified dependent spouse
or child through Plaintiff's employment.

6.  In recognition of the fact that the relationship
    between the petitioning employer and alien may change
    due to the lengthy period of time it takes for USCIS to
    adjudicate an adjustment of status application,
    Congress passed the American Competitiveness in the
    Twenty-First Century Act of 2000 (Public Law 106-
    313)("AC21"). AC21 permits the alien worker to adjust
    status based on employment with a different employer
    than the company that filed the I-140 visa petition, if
    the job duties of the new employment are the same or
    similar to the occupational classification certified by
    the Department of Labor.

7.  General requirements for employment-based adjustment of
    status applications are that the alien is the
    beneficiary of an approved I-140 visa petition (or is
    the spouse or child of an alien who has been granted
    employment-based adjustment of status), is in lawful
    immigration status, has a visa number immediately
    available under the annual per-country and preference
    category quota, and is not inadmissible to the United
    States under listed statutory grounds that include

health-related, criminal, and national security provisions.

8.  On July 2, 2007, the Department of State announced that all employment-based visa numbers under the fiscal year numerical limitations set by Congress have been used and that employment preference numbers will be once again be available beginning October 1, 2007, under the fiscal year 2008 annual numerical limitations.

9.  Plaintiff's application for adjustment of status is ready to be adjudicated except that his background and security check has not been completed by the Federal Bureau of Investigation, and there are no more employment-based visa numbers available for adjustment adjudications during fiscal year 2007.  When the fiscal year 2008 visa numbers become available on October 1, 2007, and Plaintiff's background check is completed, Plaintiff's case can be adjudicated.

10. The attached Fact Sheet explains the different types of background and security checks relevant to the statutory requirement that the alien be admissible to the United States that must be completed prior to adjudication of Form I-485.

11. When an alien applies for adjustment of status, USCIS conducts several forms of security and background

checks to ensure that the alien is eligible for the immigration benefit and that he or she is not a risk to national security or public safety. In addition to records checks against DHS's own immigration systems, these background checks currently include (a) a Federal Bureau of Investigation (FBI) fingerprint check for relevant criminal history records on the alien (e.g., arrests and convictions); (b) a check against the DHS-managed Interagency Border Inspection System (IBIS) that contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies, such as the Central Intelligence Agency (CIA), FBI, other divisions of the United States Department of Justice, Department of State, DHS/U.S. Customs and Border Protection (CBP), and other DHS agencies (IBIS includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity); and (c) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS.

12. These law enforcement checks have revealed significant derogatory information on various alien applicants for

immigration benefits, including applicants seeking permanent residency, which has resulted in the alien being found ineligible for the benefit and USCIS's denial of the application.  Where applicable, the information has also resulted in aliens being arrested by law enforcement agencies or charged under removal grounds and deported from the United States following a final order of removal.  In many instances, the disqualifying information on the alien has been discovered as a result of the IBIS or FBI name checks, but it has not been revealed by a fingerprint check alone.

13. Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and thorough background checks on aliens who are seeking immigration status in the United States has required procedures that sometimes result in individuals not receiving their documents and benefits as quickly as in the past.  In order to ensure national security and public safety, as well as to reduce the waiting time for adjudication and documentation of lawful status, USCIS is currently working with DOJ, DHS, and ICE to develop and implement improved procedures that will ensure that all of the background checks are completed and the results

considered as quickly as possible.  However, the public
safety requires USCIS to make certain that the checks
have been done before it adjudicates any application or
petition and before it issues any immigration status
documents to such persons.

14. USCIS will continue to perform any outstanding
background and security checks as expeditiously as
possible to help ensure that no eligible alien must
wait longer than is reasonably necessary to receive a
decision on his or her application or petition and to
receive evidence of his or her immigration status.

15. The fingerprint check must be less than fifteen months
old at the time any application or petition is
adjudicated.  Plaintiff was fingerprinted on September
2, 2005 and March 20, 2007.  Rescheduling of
fingerprints is done to ensure that the fingerprint
checks remain current and that the cases will be
adjudication-ready once the security check is completed
and visa numbers become available.

16. For Plaintiff's application, the preliminary IBIS
checks have been completed.  Remaining IBIS checks are
performed by the officer at the time of final
adjudication if deemed necessary.

17. Since 9/11, USCIS has submitted millions of name check requests to the FBI, thus taxing that agency's resources and creating a backlog in FBI's performance of complete security checks.

18. Plaintiff's name check request was electronically submitted to the FBI on June 21, 2005, less than one week after his Form I-485 was filed. The FBI electronically acknowledged receipt of the name check request on June 22, 2005. The name check remains pending.

19. There are five USCIS regional Service or Benefit Centers throughout the United States, each of which has jurisdiction over certain applications and petitions filed by persons or companies within its respective geographic jurisdiction, and/or exclusive nationwide jurisdiction over other types of applications. These Centers adjudicate cases on a mail-in basis only; they do not conduct in-person interviews. Employment-based adjustment of status cases like Plaintiffs' are handled at the Nebraska and Texas Service Centers.

20. The Nebraska Service Center currently has approximately 73,135 employment-based Form I-485 adjustment of status cases pending, about 17,741 of which are still awaiting completion of FBI name checks before they can be

adjudicated.  Of an additional 81,970 (estimated) pending asylum/refugee-base Form I-485 adjustment of status cases, there are approximately 10,340 awaiting responses on FBI name checks.  Of a total figure of 72,793 naturalization filings being processed at the Nebraska Service Center, there are approximately 21,279 awaiting responses on FBI name checks.  Cases in which the pending FBI name check is the only impediment to final adjudication are audited on a weekly basis in order to identify those in which a response from the FBI has been received.  Once the security checks are completed, the case can be evaluated for visa number availability.

21. Service Centers have a process for expediting processing of certain applications and petitions. However, it is important to note that whenever a particular application or petition receives expedited processing and is moved up in the adjudications queue, it is at the expense of those still unadjudicated petitions or applications that bear an earlier filing date.  If, for example, USCIS asks the FBI to expedite a case, this action comes at the expense of other name check cases, many of which have been pending since December 2002, because FBI would have fewer resources

with which to work the other pending cases. USCIS is
currently limited in the number of expedite requests
that can be made to the FBI each week, and there is a
backlog even in submitting the expedite requests for
cases that have been deemed to meet expedite criteria.

22. In order to address in a consistent and fair manner the
increasing number of mandamus actions filed nationwide
by aliens awaiting decisions on their petitions and
applications, USCIS issued specific guidelines for
requesting an expedited name check from the FBI.
Expedited processing may be pursued in cases at USCIS's
discretion for military deployment, age-out cases and
applications affected by sunset provisions, significant
and compelling reasons such as critical medical
conditions, loss of social security benefits or other
subsistence, severe financial loss, extreme emergent
situation, humanitarian situation, nonprofit status of
requesting organization in furtherance of the cultural
and social interest of the United States, Department of
Defense/National Interest requests from official U.S.
government entity, USCIS error, or compelling interest
of USCIS.

23. To my knowledge, Plaintiff has not made a formal
request for expedited processing. Expedite requests

are determined on a case-by-case basis.  Plaintiff
states in his complaint that he wishes to have his
green card quickly so that he may qualify for "valuable
immigration benefits" for which lawful permanent
resident status is required.  This is a common reason
for aliens to desire lawful permanent resident status
and does not generally, as a single factor, constitute
a special circumstance that would justify emergency or
expedited processing.  Other common reasons include
inability of non-lawful permanent residents or non-U.S.
citizens to:  travel and work without restriction,
acquire time for naturalization eligibility, get grant
funds for research, apply for desirable jobs, qualify
for scholarships or fellowships, or get in-state
tuition for self, spouse or dependents.

24. Another common factor in the many mandamus lawsuits
filed against USCIS and involving pending FBI name
checks are the plaintiffs' claims that they made
repeated status inquiries about their case to USCIS,
FBI, Congress, and the White House.  While multiple
status inquires show the applicants' frustration with
the pace of the processing of their applications, the
inquiries, and mandamus actions, increase the workload
of the FBI or USCIS, rather than having the effect of

faster or special treatment of the subject applications.

25. Most applicants for adjustment of status may apply for and be granted (usually in one-year increments) work authorization documents and advance parole documents to enable them to travel abroad while their application is pending.  Incident to his status as a pending adjustment applicant, Plaintiff currently holds a work authorization document permitting him to work for any employer he wishes valid through June 25, 2008.  In addition, Plaintiff holds an advance parole travel document valid through February 15, 2008.

26. The Nebraska Service Center is processing Mr. Stepanov's adjustment of status application in accordance with standard procedures.


I declare under penalty of perjury that the foregoing is true and correct.


Executed at Lincoln, Nebraska
on this 13th day of September, 2007.


F. Gerard Heinauer
Service Center Director
Nebraska Service Center

Press Office
U.S. Department of Homeland Security



# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

**How Immigration Security Checks Work**

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

---

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

ALEXEY STEPANOV,

    Plaintiff,

       v.

MICHAEL CHERTOFF, Secretary, Department
of Homeland Security

ALBERTO E. GONZALEZ, Attorney General

EMILIO T. GONZALEZ, Director, United States
Citizenship and Immigration Services

F. GERARD HEINAUER, Director, Nebraska
Service Center, United States Citizenship and
Immigration Services

ROBERT MUELLER III, Director, Federal
Bureau of Investigation

    Defendants.

Case No: 5:07-CV-02492

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy

and the procedures of the United States Citizenship and Immigration Services ("USCIS").
Specifically, I am aware of the name check request for ALEXEY STEPANOV, the plaintiff in
this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)     The National Name Check Program ("Program") has the mission of
disseminating information from the FBI's Central Records System in response to requests
submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign
police and intelligence agencies, and state and local criminal justice agencies. The Central
Records System ("CRS") contains the FBI's administrative, personnel, and investigative files.
The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower
Administration. That executive order addresses personnel security issues and mandates National
Agency Checks as part of the pre-employment vetting and background investigation process for
prospective Government employees. The FBI performs the primary National Agency Check
conducted on all United States Government employees. From this modest beginning, the
Program has grown exponentially, with more and more customers seeking background
information from FBI files on individuals before bestowing a privilege, such as Government
employment or an appointment, a security clearance, attendance at a White House function, a
"green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and
local agencies regularly request FBI name searches. In addition to serving our regular
Government customers, the FBI conducts numerous name searches in direct support of the FBI's
counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)     The FBI's CRS enables the FBI to maintain all information which it has
acquired in the course of fulfilling mandated law enforcement responsibilities. The records
maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files
compiled for law enforcement purposes. This system consists of a numerical sequence of files
broken down according to subject matter. The subject matter of a file may relate to an

2

individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)    FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)    Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)    The entries in the General Indices fall into two categories:

    (a)    "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

    (b)    "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)    In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system consists of the following three automated applications that support case management functions for all investigative and administrative cases:

    (a)    Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using

3

fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b)   Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)   Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 98.7 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)   The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

4

(11)     When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)     If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a birth date or social security number, it is designated an "Ident."

### RESOLUTION RATE

(13)     Historically, approximately 68 percent of the name checks submitted by USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

5

(14)    For the name check requests that are still pending after the initial electronic check, additional review is required. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(15)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

## GROWTH OF THE NAME CHECK PROGRAM

(16)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

## USCIS NAME CHECK REQUESTS

(17)    In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively

6

identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(18)   In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests.

(19)   The FBI's processing of those 440,000 resubmissions has delayed the processing of regular submissions from USCIS. As directed by USCIS, the FBI generally processes name check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check be expedited.

(20)   The FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of priority checks the analyst must process for, among others, military call-ups, medical emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and

7

resources available to conduct the checks. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(21)  It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

## PLAINTIFF'S NAME CHECK REQUEST

(22)  The name check request for plaintiff ALEXEY STEPANOV was submitted by USCIS to the FBI on or about June 22, 2005, and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(23)  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this __14th__ day of June 2007.


MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

8

EXHIBIT C

*Office of Communications*
**U.S. Department of Homeland Security**



U.S. Citizenship
and Immigration
Services

February 20, 2007

# USCIS Update

## USCIS CLARIFIES CRITERIA TO EXPEDITE FBI NAME CHECK
*Federal Litigation Removed as Sole Basis to Expedite Check*

WASHINGTON – U.S. Citizenship and Immigration Services (USCIS) is no longer routinely requesting the FBI to expedite a name check when the only reason for the request is that a mandamus (or other federal court petition) is filed in the case.

USCIS may continue to request an expedited FBI name check if the case meets one of the other approved criteria, including:

1. Military deployment,
2. Age-out cases not covered under the *Child Status Protection Act*, and applications affected by sunset provisions such as diversity visas,
3. Significant and compelling reasons, such as critical medical conditions, and
4. Loss of social security benefits or other subsistence at the discretion of the USCIS District Director.

The FBI name check is an invaluable part of the security screening process, ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens. USCIS also requests an FBI name check to screen out people who seek immigration benefits improperly or fraudulently and ensure that only eligible applicants receive benefits.

Information about the FBI name check is available on the USCIS website at http://www.uscis.gov or by calling the USCIS National Customer Service Center toll free at 1-800-375-5283.

–USCIS –

On March 1, 2003, U.S Citizenship and Immigration Services became one of three legacy INS components to join the U.S. Department of Homeland Security.   USCIS is charged with fundamentally transforming and improving the delivery of immigration and citizenship services,  while enhancing our nation's security.